I hope you have a nice experience in the court today. We have procedures that you're probably aware of already, but I'll repeat them because we always do. The first one is that our time signals are very precise. When you have two minutes left, a yellow light comes on, and you should begin winding up your argument. When the red light comes on, you should definitely wind up your argument unless you're answering a question from the court. Second point is that we have read the briefs and record excerpts. We have not necessarily had the opportunity to get into the entire record before oral arguments, so we very much appreciate citations to the record. We will take a short break after the second argument of the morning. The first case is number 17-40825, Cumpian v. Alcoa. We'll hear first from Mr. Voyles. May it please the Court. My name is Adam Voyles, and I represent Oscar Cumpian. Mr. Cumpian, we bring this case, we bring this appeal because the district court erred in three general respects with regard to the handling of Mr. Cumpian's case. The first error related to the citizenship of the parties. The second error related to the evaluation of improper joinder, and the third error related to the disposition of the summary judgment. We believe that if we're correct on the first two errors, the court never needs to reach the issue on the summary judgment because the case should have been remanded after it was determined that there was not diversity jurisdiction and the court did not have subject matter jurisdiction. Well, just humor me for a second, sir, and tell me where you got, where you or your client got the idea that PMIC, a marine and industrial coating company, would have had anything to do with cleaning out the pipes before the exchange of blinders. Absolutely, Your Honor. PMIC— There is Rule 11, you know. PMIC Palacios was the contractor with the contract to work the tank farm. Turner had the contract to work the tank farm and lost it several years or some period of time before. My client was working in the digester unit because Turner no longer had the contract to work the tank farm and was not allowed to work the tank farm. That is why my client believed and understood that Palacios was the party that was specifically responsible for handling the duties in the tank farm. Turner was not allowed in that area. So that is why Palacios was sued. Palacios. Palacios. Palacios was sued. And when my client, when the emergency arose, my client was brought over to the tank farm area to address this catastrophic spill. Well, what threw me off was that it sounded to me as if marine and industrial coatings meant that they were responsible for paint and waterproofing and weatherproofing and, you know, that kind of thing, not for, quote, operational work. No, they absolutely were an operational operator out there at this facility and had underbid Turner to get the contract specifically as it related to the tank farm. All right. Could they, in addition to Alcoa, be liable? Could they both be liable? Absolutely. They could definitely both be liable. Why? Well, for two reasons. Number one, Alcoa, as Alcoa says, they're the ones that they allege that they were solely responsible for maintaining these tanks. The problem is, Palacios was the party out there that we understood was actually the one that caused the spill. What we understand is Palacios, Palacios, I'm sorry, Palacios did not pull the blinds. And so what happened was when they started the unit, there was an overflow of the caustic liquor because the blinds had not been pulled that went through the pipes and it backed up and that's what caused the spill. So your client, if his name is Kumpian, you're pronouncing it with a Spanish accent, is he Hispanic? Yes, he is, Your Honor. Okay. There was something in the briefs about the fact that the fellow who was actually undoing the bolts was Spanish speaking. Yes, that's true. My client is of Hispanic origin but does not speak Spanish. Oh, okay. So the second error is with respect to the improper jointer with respect to PMIC. The third is with respect to the granting of the summary judgment. With regard to citizenship, when the plaintiff's original petition was filed, Mr. Kumpian was identified as a resident of Texas. In the notice of removal, Alcoa identified Mr. Kumpian as also a resident of Texas. When that issue came up to the district court, the district court was obligated to look at the citizenship of the parties and make a determination. In this case, the district court equated residency with citizenship. And as this court knows, residency does not equal citizenship. So at that point, the case should have been remanded because Alcoa failed to present or carry their burden of identifying Mr. Kumpian as a citizen of the state of Texas. What was he a citizen of? He was a citizen of the state of Texas, but on the record at the time, there was no evidence that he was a citizen of the state of Texas. Just like it's also — You can't have it both ways, really. Well, I understand, Your Honor, and I — Well, I mean, that's so hyper-technical, that — under these circum — you're talking about citizenship, removal. The court is entitled to — certainly we're entitled at our level to take notice of the fact that when he was deposed, there was no question that he was a citizen of Texas. Well, that may be true, Your Honor, but it's just — it's similar to when there's a removal by a corporation and the corporation says, we are not — we do not have a principal place of business in Texas. And this Court has held that that is inadequate on the removal adequate. And you know what we do? We stay and remand for the facts to be clarified most of the time. So you don't want us to have to do a futile thing, do you? Well, Your Honor, that — it's — the court has to make a subject-matter determination, and if it was remanded for the facts to be determined, it's insubstantial. But may I suggest that if you rested on your second point rather than on your first point, you might have a better chance? I will absolutely do that, Your Honor. The second point is the improper joinder. The improper joinder issue is — what the court did is it applied its own test for evaluating improper joinder. The court said that the test is whether it cannot reasonably predict that Kumpion will recover from PMIC. Kumpion — the test of Kumpion will recovering is not the test promulgated by this Court in Smallwood. The test is whether there is no possibility that Kumpion could recover against PMIC. And so what's happened here is the court has substituted its own test, which is clearly not the correct test, in evaluating the improper joinder. Then it incorrectly did the procedure in evaluating the improper joinder. What the district court is supposed to do is do a 12B6 type of analysis to determine whether or not, upon a quick inspection, the pleading meets a 12B6 requirement. In this case, we do not know exactly what the court did. Presumably the court did a 12B6 analysis, assumed it did satisfy the requirement, and then it did an evidentiary standard. And what it did is it looked at evidence, pierced the pleadings, and made a determination that PMIC could not be liable and had no duty. And the court did that determination based on the affidavit of Maley, who is an employee of Alcoa, in the notice of removal. So it not only did an improper test in evaluating it. When it did its analysis, it did an evidentiary standard, and then it inferred facts against Mr. Kumpion to his detriment to determine there was improper joinder. So it was almost a summary judgment standard without Kumpion being given an opportunity to present evidence on that issue at that stage. So we believe that was clear error, both on the test and the procedure, and that at that point the case should have been remanded. I mean, to be fair, the language of reasonable prediction is in Smallwood in addition to, it's right after the no possibility language, right? Well, I think Smallwood says no possibility, reasonable prediction, but it's not reasonable prediction, will recover. I think the error here is the will recover as opposed to might recover. And so it's a more exacting standard that the district court is imposing on Mr. Kumpion than what was set forth in Smallwood. And I also believe in Smallwood that the court said that this was the test, that courts were not supposed to create their own test, their similar test, that they were supposed to follow this specific test. And the court clearly did not do that in this case. So more importantly, when it, even after it did apply the test, when it did the procedure, it didn't look at a 12B6, or if it did, it's not clear from the record. I think the procedure is they're supposed to look at the 12B6. If it satisfies that, then it can pierce the pleadings. In this case, we jumped right into pleadings piercing, relied on the affidavit of evidence. I think the court said that Alcoa says that PMIC owed Kumpion no duty to ensure the tanks were safe. But that's Alcoa. There's no evidence from PMIC as to what they were doing. Or there's no denial by PMIC that they were not out there operating the tank farm or that they were not responsible. And so we simply were at a disadvantage because we were not given the same opportunity or the same inferences that the court gave Alcoa. Just for the sake of argument, what are you going to contend at trial, if you were to go to trial? Would you contend that PMIC left the sodium hydroxide in the pipe, or are you going to contend that Alcoa left it? That's a very good question, and that leads to kind of the next point, which is discovery. Well, I mean, you're sort of — but I'm just saying at this point, you're sort of trying to take opposite, you know, two conflicting theories, right? I don't think so, Your Honor. I think what we're saying is — and what we had pled was that PMIC was the party responsible for clearing the tanks. They were the party responsible for causing the spill initially, and they were the responsible for clearing the tanks. We still believe that's probably true, and we have other evidence that subsequently come out to suggest that that may, in fact, be the case. But the significance here is that we weren't given the benefit of discovery with respect to this issue where the court unilaterally made a determination based on what Alcoa says, not what PMIC says. So — Did you ever determine who put the pink tags on? What's that? Did you ever determine who put the pink tags on? We never did. As you'll recall from the evidence that Maley said, Maley says this is our procedure. But there was no evidence as to who specifically did that. And in the Morales decision, which is not, obviously, before the Court, but is a case that has similar facts that's in the State court, in that case, Morales was an employee of Turner. We sent a letter brief to the Court on that decision. And in that case, in the evidence in that case, it suggests that Turner, in that timeframe, was actually involved in that procedure actually inspecting the tanks. So — Is the Kilwart case the same night, the same events as we're dealing with in this case? No, it's not, Your Honor. I think it happened a year and a half later. So — If Turner was responsible, you'd only get a comp, right? Beg your pardon? If the employer, Turner, was responsible, you'd be relegated to compensation? We would absolutely be comp barred. But we know Turner could not have been really responsible here in the sense that Turner did not have the tank farm contract and Mr. Kumpion was working in the digester unit. He's a boilermaker. He had worked the entire day there when this catastrophic spill happened. He was pulled in an emergency situation off of that and thrown into this very dangerous situation. And there was a co-worker who undid the bolts before he got out from under the pipe. Yes. That's very unfortunate, Your Honor. Yes, that is very unfortunate. It's horrific. What were the damages suffered? You said he was flown to San Antonio, or he went to San Antonio for burn treatment. I take it that was at Fort Sam? Yes. Yes, Your Honor. And the injuries are horrific. He still has open wounds on his leg where the spill was.      He's still bleeding. He's still bleeding. He's still bleeding. He's still bleeding. He's still bleeding. He's still bleeding. He's still bleeding. He still has open wounds that, to this day, look like they just happened. And he wraps them and they bandage them, and I really don't know that we have a solution to it. He walks with a cane. He's very debilitated because of this. So we think, as we've said in our papers, we believe that the remand was improperly If we're wrong, then I think with respect to the summary judgment, and I'll be very quick with that, the summary judgment was wrongly decided because, number one, we weren't given discovery. Number two, the court ignored Mr. Cumpion's declaration. And the court's reason for ignoring the declaration does not make a lot of sense to us. Let me just point out to you a few things that the court did say. It says that the plaintiff could not express what additional discovery he needed, number one. And it said that there was a Turner safety meeting that day, and Turner assigned Cumpion on to work on this matter. And the safety meeting had to do with changing the blinds. It also says that this plaintiff had changed five blinds a day for two years. Yes. He does change blinds in a different section of the facility. With pink tags and all that. I mean, I assume there's a lot of caustic material in this plant, right? Nothing in comparison to what happens in the tank farm, which is why that section is very restricted. And so he worked in a digestive unit where they dealt with the raw material, which I do not believe is caustic. It's like rock or gravel. And the changing of blinds was of no—it was a totally different scenario as far as safety and protocol. In fact, as the court knows, he came over in a paper Tyvek suit to do the work because that's what he wears in his job because it's not nearly as dangerous and you're not dealing with caustic liquor. So they pull him off in his normal job, working eight hours. He's in a regular paper suit. They throw him into this caustic liquor situation, and that's why—that's one of the reasons he gets burns. He doesn't have the proper protective wear on. And the characterization of this as a safety meeting is not accurate, I don't believe. It was an all hands on deck. We have a spill. Get out there and start spilling it. Well, what about the issue, though, of you did not identify what further discovery you needed? Sure. That seems to me to be central to why you think there was reversible error on that part. Yeah. Absolutely. And as the Court will see, I filed several motions where I specifically articulated exactly what discovery I wanted, why it was important. I had an affidavit from an expert explaining why that information was important. And what's so significant about this is in the Morales case, we have seen some of the discovery, and that's why the Court of Appeals held, with respect to similar facts, that they thought that there was evidence of control by Alcoa. Because Alcoa has a specific policy and procedure which dictates exactly how the work is going to be done. And the Court of Appeals in Corpus Christi said that is some evidence of control. They also identified there was That's nonsense. I don't agree with that at all. I think that would completely undo the point of that Chapter 95 to specify that alone. I'm not saying the facts are not in accord with denying summary judgment here, but that interpretation of Chapter 95 has got to be wrong. Otherwise, there would be no subcontractor or contractor insulation for any company that has to have safety procedures. Your Honor, I appreciate it. I've run out of time. That's okay. You can answer my question. Sure. First of all, I think there is a question here whether Chapter 95 even applies. Number one. If you look at the case law cited by the defendants, there is not a case where it's a similar situation. Mr. Kumpion was engaged, and I do not believe activities which would be reasonably characterized as constructing, repairing, renovating, or modifying an improvement. So I'm not sure Chapter 95 applies. But secondarily, we didn't get the opportunity to get discovery to find out specifically what the control was. Here's what we do know. We know that they controlled whether you could do a lockout and tagout. Had Mr. Kumpion been able to do his own lockout and tagout, meaning inspect the tank before he did the work, this would not have happened. And they were adamant that they controlled that aspect of the job. And I think that made it more dangerous. Thank you very much, Your Honor. All right, sir. Thank you. Okay. Ms. Tee. May it please the Court. Good morning. I'm Melissa Tee here on behalf of Alcoa. The issue of diversity jurisdiction boils down to one specific question before this Court. Did Mr. Kumpion come forward with some facts that might establish that he might recover from PMIC? There's one allegation in the petition about PMIC, and that's that PMIC did the lockout-tagout work on the tank that Mr. Kumpion was working on when he was injured. That's the only allegation. In its notice of removal, Alcoa argued that PMIC Palacios was joined improperly because it was able to establish that a material fact had been omitted or was false in the petition. And that's the instruction that this Court gave in the Smallwood case. The Court can decide an improper joinder issue in one of two ways. It can do the 12B6 analysis, or in its discretion, it can pierce the pleadings and determine whether or not a material fact has been omitted or is false. If the party makes a showing that there's been an omitted material fact or a material fact is false, then it can pierce the pleadings. Alcoa made that showing. Alcoa came forth with a Dwayne Malley affidavit. Mr. Malley is responsible for the lockout-tagout procedure. I may refer to it as LTV. Mr. Malley says that the allegation in the petition against PMIC, which is that PMIC did the lockout-tagout work, Mr. Malley says that allegation is false. Well, he says it's, we have procedures. He doesn't say what happened on the date or time of this event. He does. He says that the allegation in the complaint that Palacios did the lockout-tagout work is not true. The issue is not who did the LTV work. This is not a merits inquiry. It doesn't matter that the affidavit from Alcoa doesn't say Alcoa did the LTV work. We're not here about whether Alcoa was improperly joined. We're here about whether PMIC was improperly joined. And so the question is, did Mr. Klumpion come forward with facts to support that allegation? And what did he come forward with? He came forward with a declaration. And his declaration says two things about PMIC. Number one, it says PMIC caused the spill. Well, first of all, it doesn't say that in the petition. And in any event, it's irrelevant. Mr. Klumpion wasn't injured during the spill. He was injured later during the cleanup of the spill. And so that part of his declaration does not go to the issue of whether or not PMIC did the LTV on the tank that Mr. Klumpion was working on when he was injured. The other thing he says about PMIC was that PMIC worked in the tank farm. We don't dispute that. They did work in the tank farm. It does not establish that PMIC did the LTV work on the tank at issue. And that's what he's got to come forward with. He's got to come forward with some facts to support the allegation in the petition. Isn't that what Discovery is for? He didn't ask for Discovery on this, Your Honor. He had the opportunity to submit a declaration in connection with his motion to remand, and he did. And he said a number of things in that declaration about PMIC, but he did not say the one thing he needed it to say, which was that PMIC did the LTV work on the tank that he was working on at the time he was injured. He doesn't say that anywhere. And he did not ask for Discovery in connection with the motion to remand. The first request for Discovery came in connection with the summary judgment decision several months down the road. So on that basis, the court and district court correctly concluded that Mr. Kumpian failed to come forward with facts to support the conclusion that PMIC might owe a duty to him. And if PMIC doesn't owe a duty to him, he's not going to be able to establish that he might be able to recover from PMIC. We think the district court reached the correct conclusion. The district court did misstate the appropriate standard. I'll agree with that. The standard is he might be able to recover, not that he would recover. But that's not reversible error. It was a harmless error because it got to the right result. With respect to Chapter 95, Chapter 95 is a statute that limits liability to premises owners for contractor injuries to situations where the owner had control over the operative details of the contractor's work and had actual knowledge of the hazardous condition that resulted in the contractor's injury. That's a threshold question that the district court has to make as a matter of law with no Discovery required. In this situation, Mr. Kumpian was tasked with going into the tank farm, going up to the pipe at issue, unbolting the flange, removing a blind that was a solid blind. It was preventing the flow of processed liquor through the pipe. It was diverting it to another section of pipe. Taking that out and putting in another blind that had a hole in it, which would allow the material to continue to progress through that section of pipe. He made a material, physical change to the pipe that changed its functionality. That's a modification of the pipe under any definition of the word. And that's when Chapter 95 applies. Chapter 95 applies when a contractor is working on an improvement to the premises owner's property in a way that modifies it, repairs it, renovates it, or constructs it. What about the aspect of this that that's the very purpose of this pipe? One day, one hour, one minute, the flow is supposed to be one way. The next minute, it's supposed to be another. That doesn't seem to be a modification so much as the usual customary mechanism of that pipe involves these constant changes. I mean, Chapter 95 is perhaps not the clearest way to deal with this sort of distinction. But it does seem to me that's a pretty big leap to say that you are modifying something when you're causing it to operate in the way that it's supposed to operate, which is at one time allowing the flow to go one way, another time allowing the flow to go another way. Well, I think it does constitute a modification, Your Honor, because it's changing the functionality of the piece of equipment. Functionality. It's changing the way it is functioning at that moment. But I don't know if you're changing the functionality, though maybe I need to get in the definition of where that's right. But I'm not even sure that's the test. It's not modifying it in a significant way. Anyway, that seems to me that's one of the questions we'll have to answer. Yeah, I understand. And there aren't a lot of cases. In fact, there are very few that discuss those particular provisions or that particular provision of Chapter 95. But even under the ordinary Webster's Dictionary definition of the word modification, changing the functionality of something does, in fact, constitute a modification. Assuming that Chapter 95 applies as Judge Hughes concluded that it did, the plaintiff can only recover against the property owner if he can establish that the property owner had control over the operative details of his work and also had actual knowledge of the hazardous condition that resulted in his injury. It's a conjunctive test. You've got to have evidence of both of those elements. Now, with respect to the first element of control, we took Mr. Klumpion's deposition and we asked him every way to Sunday who controlled his work. Who gave you the job assignment? Turner. Who told you how to do it? Turner. Who gave you your instructions? Turner. Who was there with you? Two Turner supervisors and my Turner co-worker. Did anybody from Alcoa give you any instructions that day? No. Did anybody from Alcoa tell you how to do your job? No. Was anybody from Alcoa even there? Not that I can recall. The only person that Mr. Klumpion testified that he came in contact to that day that was from Alcoa was at the safety meeting that took place before they were sent out to do their job and the Alcoa supervisor told them to be safe. That's all he said, be safe, be careful. And Texas Supreme Court has been very clear about this and Judge Jones, you pointed it out. A property owner can require its contractors to comply with its safety instructions without incurring liability under Chapter 95. Otherwise, it's an absolutely perverse incentive to property owners to make sure it has safety instructions to protect people at its plants. Those admissions that Mr. Klumpion made on control in his deposition are fatal to his Chapter 95 claim. He cannot establish an issue of fact on control based on his own admissions. Well, you do have to agree that discovery was seriously constrained here. I do. I understand that Judge Hughes' discovery order was unconventional. But was it reversible error, which is the question before this court? The answer is no. Well, there's this McCoy case, albeit unpublished, that suggests it was. Well, let's talk about the McCoy case because I think there's a very critical distinction between McCoy and in this case. In McCoy, Judge Hughes acted as a fact finder in that case. He rejected the plaintiff's deposition testimony. He found it to be not credible. In this case, Mr. Klumpion's deposition testimony on control was taken as true. And his own testimony was fatal to the Chapter 95 element of control. That situation did not exist in McCoy. The McCoy plaintiff did not have admissions that were fatal to his claim. And an additional discovery may have helped him. But at what point did he have that? I don't, I still don't, I'm not quite sure that Mr. Klumpion's perception of things would carry the day because the error, if there was an error, was in improperly placing the pink tag on, right? Well, I. Well, there are, I mean, there's more than one allegation against Alcoa, right? There is. There is, Your Honor. And in respect to the pink tag and who did the LTV work, I want to make one point because as the petition alleges that Palacios did the LTV work, Mr. Klumpion subsequently submitted a declaration in connection with the motion for summary judgment in which he testifies under oath that Alcoa did the LTV work. You can't have it both ways. He can't allege in his petition that Palacios did the LTV work and then submit a declaration under oath saying that Alcoa did the LTV work. But again, whether or not the LTV work was done by Alcoa and who put the pink tags on it is not at issue. The question is, was Mr. Klumpion able to establish some evidence that Alcoa controlled the operative details of his work? And his work was to swap out the blinds. Whether or not Alcoa controlled the LTV process for that tank at issue, that would be control over its own work. Chapter 95 requires that there is evidence that Alcoa controlled the contractor's work. And Mr. Klumpion doesn't say he did the LTV work, he says the opposite. He says, I didn't do the LTV work, Alcoa did the LTV work. Well, if Alcoa did the LTV work, Chapter 95 would excuse Alcoa from any possible liability for leaving the dangerous fluid in the pipe. Because Alcoa didn't know it had left the dangerous fluid in the pipe. Is that your defense? That would be a defense, because that goes to the actual knowledge requirement of Chapter 95. That the property owner has to have actual knowledge that there was material left in that pipe in order to be liable to the plaintiff. And we don't believe there's any evidence that Alcoa had any actual knowledge. But we think this court doesn't even get there, because we think Mr. Klumpion's concessions, admission- But Alcoa's not bound by knowledge of errors that its employees have committed? If Alcoa has that knowledge, or if its employees have that knowledge, Alcoa may in fact be bound, but there's no evidence of that. Well, obviously something went wrong, right? That's correct. Yeah, something went wrong, and Alcoa says only Alcoa was the one to do the LTV process. So obviously something went wrong, and according to Maley's declaration, it had to be Alcoa that went wrong. That's correct, Your Honor, but that would be the analysis under a straight negligence claim. And the Texas Supreme Court has made it clear that Chapter 95, if it applies, becomes the plaintiff's exclusive remedy. And the only recovery that can be had is upon a showing of control and actual knowledge. And the plaintiff's admissions on control are fatal to that claim. What about the argument that the plaintiff's perception was directed by Turner? In other words, that he was two steps removed from whoever was giving the instructions in an emergency situation? Well, I don't think that there could be any better evidence of who gave Mr. Klumpion instructions and who controlled his work than Mr. Klumpion's own testimony in that regard. Again, it has to be. But again, there was no discovery, right? There was no discovery after, well, there was some discovery, including Mr. Klumpion's deposition. So he did have the opportunity to testify. He had no discovery to even know who was the supervisor at the Alcoa premises that day. Well, actually, you raise an interesting point, because there was some discovery on that. Mr. Klumpion testified that it was an Alcoa employee named Mr. Navarro. But it turns out that you may have noticed that there was a fourth defendant alleged in this case who was added to this case, Steven Alvarado. He was an Alcoa employee, and Mr. Klumpion alleged that Mr. Alvarado gave him instructions that day. Mr. Alvarado told him what to do. And then in connection with our removal notice, we filed an affidavit from Mr. Alvarado who said, I wasn't even in the building that day, I didn't do this, I didn't tell him anything. And the plaintiff subsequently agreed, and they basically dropped Mr. Alvarado from the suit. And so that goes to the same point about Palacios, which is- I mean, really, as you see, I'm inclined to be a very strong defender of Chapter 95, but the Alcoa position is hear no evil, see no evil, and the other side can't see no evil either. That is not our position, Your Honor. Well, it is. I mean, you admit that it's a very unconventional discovery order. It is an unconventional discovery order, but it's not harmless error. Because the plaintiff would not have benefited from any additional discovery. No additional discovery would have availed the plaintiff of any facts that would be sufficient to defeat Alcoa's motion for summary judgment under Chapter 95 because of his admissions under control. Basically, you're saying, are you saying that Alcoa had delegated the entire operation of the plant out to contractors? No, absolutely not saying that. But they do have clear delineation. Who was in charge of responding to the spill? From the top level, it would, of course, be Alcoa. But Alcoa has contractors on the property for specific reasons. I mean, I have to say, this is a very clever argument, but my goodness. You don't have a single fact except that, quote, he didn't prove any. He, the little guy at the bottom of the totem pole, doesn't know or he contradicted what was the actual setup. And it's very hard for me to see how the guy at the bottom of the maintenance totem pole can tell where directions are coming from above, especially in something that's a spill that could involve all sorts of regulatory authorities and physical risk and so on. Well, I disagree, Your Honor, with all due respect with the characterization that all we're going on here is Mr. Kumpy and saying he doesn't know or a lack of evidence. He testified in his deposition that Alcoa did not ever give him any instructions that day, that his Turner supervisors told him what to do. And the case law is very clear that you have to have evidence that a property owner controlled the operative details of the contractor's work. Had to have told him how to do the job such that he wasn't able, he wasn't free to do the work in the way that he wanted to do. So you're saying if Alcoa told intermediaries and Turner passed that message on to Kumpyon and Kumpyon only heard from Turner, that's it? There's no liability? If Alcoa had told Turner, if there was something that- Which discovery might have determined. I mean, that's the problem with your position, is there's no discovery because of Judge Hughes that amounts to anything relevant to what we're talking about. And yet you're saying because Kumpyon didn't know and he acknowledged what he knew, you're successful. It's a tough battle for you to succeed on that. It seems to me you need some principle of law relevant either to Chapter 95 or more generally to this case that says his lack of knowledge, which is the result of the discovery limitation, isn't itself binding in some way on him. Well, I would like to remind the court that this is not the first time that Mr. Kumpyon has changed blinds at the plant. As he testified, he changed blinds five times a day for months, maybe years, at the plant. And notwithstanding what Mr. Voyles said, this is the same pipe system. It is the same caustic liquor material flowing through these pipes. It's nothing different other than it's in one building versus a different building. There really wasn't a modification, it seems to me. It's the same system, the same blinds operating in the same way. That's a different point, though. Keep going on the point you're making. So the point there is that Mr. Kumpyon had worked there for some period of time doing the same exact job over and over again. If he did not believe that Turner wasn't giving him his instructions, or if he thought that Alcoa was giving him instructions, then he wouldn't have testified the way he did in his deposition. Just about out of time. Are there any further questions? No, ma'am. Thank you. Thank you. I just have a few rebuttal points. I'd like to refocus the court's attention back on the improper joinder issue. And there's a significant fact here that is omitted, which is that we did not ask for discovery related to the improper joinder. What we did not know before the decision came out that there was going to be an evidentiary analysis as to the joinder issue. Obviously, had we known that, we would have requested it. Now, we know what the outcome of that would have been, because we did request it multiple times in connection with the summary judgment were denied. But the point was, they filed a removal. They have an affidavit, not from PMIC, but from Alcoa. And we were not given the benefit of having that opportunity before the decision came out. And I also want to point out- Let me ask, did you move for reconsideration and ask in light of that discovery first because of this new issue? No, we did not. And I'll tell you why. And it touches on what Judge Jones mentioned, was why we sued PMIC to begin with. And what the district court did order was that PMIC provide a list of the employees that were out there at the time and what they were doing. Now, I will tell you, that documentation is almost unreadable, but it does identify employees. So they were out there apparently doing stuff at that time. What do you mean it's unreadable? It's like a spreadsheet that identifies, in my recollection, identifies the employees and identifies kind of job duties like maintenance or supervisor. It's not, it's not, it doesn't give any detailed description behind it. And so we can't, it wasn't that interpreted. What's that? You would have needed discovery to understand that. Yes, we would need to find out what these people did based on these job titles, that sort of thing. But, so going back to this improper joinder issue, it's, they weren't denied, Palacios or PMIC was not denying that they were out there. They in fact produced documents showing who was out there, but we don't know what they were doing. And the significance is what we don't know. Meaning that the pink tags are a red herring here because we don't know what that means, okay? We haven't gotten discovery to know what, when it's pink tagged, does that mean it's completely de-energized? Does that mean there's nothing in it? Does that mean there's a small amount in it that doesn't matter? It obviously means that Alcoa thought it was safe. So I don't think we need to go any farther than that. What's your specific response to her statement that the only fact you have to connect PMIC to the accident is that Cumpion's declaration says that PMIC caused the spill. Not that PMIC did the LTV or placed the pink tag on the pipe. Okay, my specific response is, when Cumpion, when he was first pulled over there to work in this area, and there was the talk among all the workers of what had happened and what caused it. The talk was that this was all caused by PMIC. So that's how he, because he knew PMIC had that contract. So the discussion among the co-workers as they were getting ready was that he did it. But that's about the tank, right? As I understand it, this caustic liquor is in some kind of tank and it overflowed, right? Correct. And they're trying to release liquid from the bottom of the tank to go somewhere that's safe. You're correct. So when they say PMIC caused it, what you're saying is that PMIC was operating the plant now, had taken the place of Turner's, so it was operating a lot of these things. And they allowed the spill. That says nothing about the cause of the plaintiff's injury. When they, you're exactly right. When they caused it, what we understood is they were responsible for putting in these open blinds, and they did not. They put in block blinds. Did the plaintiff say that? Blinds? I think, I don't recall specifically. Well, we have to go back to his declaration. Yeah, I'd have to look at his deposition. But I think he said that was his understanding of what caused the spill to begin with. Was that instead of having the hole so it could flow, it hit a blind and then it backed up and it was gurgling over the top of the tank, which was then spraying all over the facility. Thank you, Your Honor, I'm out of time. All right, thank you very much. Thank you.